# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

GRACE ANN NETTI,

                                        Plaintiff,

        v.                                              5:17-CV-976
                                                        (GTS/ATB)
CHRISTOPHER AYERS, et al.,

                                        Defendants.

GRACE ANN NETTI, Plaintiff, pro se

ANDREW T. BAXTER
United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

The Clerk has sent to the court for review a civil rights complaint, together with an application to proceed in forma pauperis ("IFP"). (Dkt. Nos. 1, 2). The complaint purports to be brought under 42 U.S.C. § 1983 "AND/OR ADDITIONAL LAW(S)." (Complaint ("Compl.") at 1) (Dkt. No. 1).  Plaintiff also mentions violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. (*Id.*)  When plaintiff filed this action, she also filed a letter requesting that the case be filed under seal. (Dkt. No. 5).  Plaintiff has also moved for appointment of counsel. (Dkt. No. 3).

## I.    **IFP Application**

A review of plaintiff's IFP application shows that plaintiff declares she is unable to pay the filing fee. (Dkt. No. 2).  Although this court has some questions regarding plaintiff's stated income, for purposes of this order and report-recommendation, the court finds that plaintiff is financially eligible to proceed IFP.

In addition to determining whether plaintiff meets the financial criteria to

proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i) -(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp*., 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp*.,

2

550 U.S. at 555).

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require "detailed factual allegations," "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009, 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (citing *Ashcroft*, 556 U.S. at 678). A pleading that contains allegations that are "'so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

## II.    Facts

Plaintiff's complaint is lengthy and difficult to understand. The court will attempt to summarize the facts as concisely and as clearly as possible.[1] Plaintiff begins by stating that she "expects all mechanics and/or inspectors to comply [with] the standard of practice in [the] automobile industry [to] adequately repair and/or complete[] safety inspections." (Compl.¶ 1). Plaintiff's problems in this regard started on December 3, 2015, when she went to defendant Harry's Tire to have some mechanical work done on her Honda Accord and to have the car inspected.[2] (Compl.

---

[1] Pro se pleadings should be interpreted liberally to raise the strongest arguments that they suggest. *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

[2] Earlier in the day, plaintiff "declined Fox Honda's service," and was referred to Harry's Tire by United Auto Supplies. (Compl. ¶ 2).

¶ 2).  Plaintiff states that she wrote the "work order," requesting that the rear rotors and pads be replaced, that the power steering hose be checked, and that the car receive its "NYS Inspection." (*Id.*)  She handed the paper to "John Doe, Service Writer."[3]  Plaintiff states that "another John Doe," who plaintiff did not know, "adversely interfered" with her during her "business relationship" because he noted that her rear right caliper also needed to be replaced and apparently made handwritten notes,[4] which "another John Doe" "aggressively demanded" that plaintiff sign, while defendant Augustine "stood by at the counter." (Compl. Facts ¶ 3 at 7).  Plaintiff states that she did not know what "his"[5] intention was at the time. (*Id.*)

It is unclear what happened after this incident because the next paragraph states that plaintiff had "[s]everal car incidents with 18 hours." (Compl. Facts ¶ 4 at 7).  Plaintiff relates three "incidents" that allegedly occurred on December 4, 2015, which made her decide to return to Harry's Tire for a "diagnosis."[6] (Compl. ¶ 5).  Plaintiff states that "John Doe, assume to be Mike Augustine," diagnosed a loose clamp, but

---

[3] Part of the confusion in the complaint is that plaintiff refers to some defendants alternately as "Doe" defendants and then states "assume to be" a specifically named defendant.  For example, although plaintiff first states that the "Service Writer" is a "John Doe," she lists "Mike Augustin" as a defendant and refers to him as the "Service Writer." (Compl. Parties ¶ 5(o)).  In the body of the complaint, plaintiff spells this defendant's name "Augustine." (Compl. ¶ 3).

[4] Plaintiff claims that there was "other information" on these handwritten notes, but does not indicate what this information was. (Compl. ¶ 3).

[5] The aggressive John Doe may be defendant Christopher Riester, the owner of Harry's Tire. (Compare Compl. ¶ 3 with ¶ 6).

[6] The incidents included something "abnormal[]" in the operation of the steering wheel during a left turn; something "banging" in the car while plaintiff was in a Post Office parking lot; and "a mechanical item in the frontal area of the driver side was abnormally moved," which caused a "highly abnormal sensation that scared [plaintiff]" also while she was in the Post Office parking lot. (Compl. ¶ 4).

plaintiff objected "based on varied abnormal sensations." (*Id.*)

Plaintiff then jumps to the "middle of December," when defendant Christopher Riester, the owner of Harry's Tire, told plaintiff that he remembered her from "years ago"[7] when she filed a complaint with the New York State Department of Motor Vehicles ("DMV"). (Compl. ¶ 6). Plaintiff states that she "[t]hus," learned of his "intention." (*Id.*)

Plaintiff claims that on December 18, 2015, she reported the "3 car incidents" from December 4, 2015 to the DMV by "video relay service."[8] (Compl. ¶ 7). An unidentified DMV employee told plaintiff to complete the "Safety Violation Complaint Form"[9] and told plaintiff not to move her car for anyone else to inspect it until the DMV Investigator had the opportunity to look at the car first. (*Id.*) The unidentified DMV employee also told plaintiff to contact her insurance company - defendant State Farm Mutual Automobile Insurance Company ("State Farm"). (*Id.*)

Plaintiff state that she contacted State Farm on December 18, 2015 to report the "incidents." (Compl. ¶ 8). "After" December 23, 2015, plaintiff received a "defense letter" from defendant Roger Bell, but she states that she "did not understand his

---

[7] Plaintiff also mentions the year 2005 in the same paragraph. (Compl. ¶ 6).

[8] A video relay service is a form of "Telecommunications Relay Service that enables persons with hearing disabilities who use American Sign Language to communicate with voice telephone users through video equipment, rather than through typed text." https://www.fcc.gov/consumers/guides/video-relay-services.

[9] Plaintiff may be referring to a "Vehicle Safety Complaint Report" which is used to place a complaint against a DMV-regulated automotive business. https://dmv.ny.gov/contact-us/report-problem-dmv-regulated-automotive-business. The DMV website indicates that prior to filing a complaint against the business, the prospective complainant "must first make an attempt to resolve the complaint with the facility management." The website also states that DMV cannot take action against a facility "unless [DMV] can find adequate evidence to substantiate the claim." (*Id.* n.2).

advanced English writing," so she "rightfully" asked for a "basic English letter," but defendant Bell refused to provide a "written translation." (*Id.*)

In January of 2016, plaintiff states that she called another unidentified employee of the DMV to "seek his permission to contact local law enforcement agency [sic] investigating my car sooner than waiting for NYS DMV," but that defendant Doe said "No." (Compl. ¶ 9). Although it is a little unclear, this court has interpreted plaintiff's sentence to allege that plaintiff asked defendant Doe at the DMV if plaintiff could contact law enforcement officials to perform an investigation before DMV did its investigation, and defendant Doe told plaintiff that she could not do that.

Plaintiff claims that in January of 2016, she called defendant Tom Ferlenda, an insurance agent at State Farm in Auburn.[10] (Compl. ¶ 10). Plaintiff claims that defendant Ferlenda immediately stated that plaintiff was "suspended," without giving her a valid reason, and then told her that it was "not [his] job."[11] Plaintiff claims that defendant Ferlenda's statements caused her such emotional distress that she had to contact her medical care provider, and plaintiff was referred to "aquatic therapy under the supervision of a physical therapist for 2x weeks." (*Id.*)

Plaintiff then states that she repeatedly instructed State Farm employees not to harass her or interfere with her car until after the DMV inspector had a chance to respond to her safety complaint against defendant Harry's Tire. (Compl. ¶ 11). Plaintiff

---

[10] Plaintiff states that she used the Video Relay Service to make this call. (Compl. ¶ 10).

[11] It is completely unclear what plaintiff claims that defendant Ferlanda meant by this statement. Perhaps plaintiff meant that Mr. Ferlanda told plaintiff that it was not his job to give her a reason for her suspension.

states that she notified defendants Ferlenda and Roger Bell, "Team Member" at State Farm before the March 11, 2016 "car investigation."  Plaintiff claims that State Farm denied her claim against Harry's Tire in February 2016, before any car inspection was conducted. (Compl. ¶ 12).

Plaintiff states that, on an unknown date,[12] defendant John Iacona, "Auto Facilities Inspector,"[13] asked if plaintiff had a family member who could interpret for her. (Compl. ¶ 13).  Plaintiff told defendant Iacona that a "qualified sign language interpreter was required in compliance with federal law." (*Id.*)  Then plaintiff states that she contacted the Victim Witness Coordinator for the Cayuga County District Attorney's Office, but that plaintiff never received a response from an unknown employee, who is apparently not a defendant in this case. (Compl. ¶ 14). Plaintiff

---

[12] From further factual development later in the complaint, it appears that plaintiff is referring to defendant Iacona's inspection of the plaintiff's car on behalf of the DMV, pursuant to her complaint against Harry's Tire. (Compl. ¶ 47).  The inspection took place March 11, 2016.

[13] The DMV website states that once a complaint is filed, a "Consumer Services Representative ("CSR") is assigned to handle the complaint. https://dmv.ny.gov/contact-us/report-problem-dmv-regulated-automotive-business.  However, if the CSR is unable to resolve the complaint, the case will be sent to an "Automotive Facilities Inspector" for a formal investigation and possibly a hearing. *Id.* Mr. Iacona may be the Automotive Facilities Inspector, although plaintiff never discusses being assigned a CSR or that a CSR was unable to resolve the complaint. The duties of an Automotive Facilities Inspector include investigating and seeking resolution to consumer complaints involving automotive service and periodically inspecting service providers for licensing compliance; obtaining information about the consumer's complaint by reviewing the file, interviewing the complainant, and soliciting third-party information "as required," obtaining the respondent's version of the events under dispute; examining the vehicle and components to determine the nature, extent, and necessity of the work performed; examining invoices, bills of sale, purchase orders and related documents to determine whether the quality and type of repair or maintenance work conform with written estimates; acting as mediator between consumers and automotive facilities in cases where no illegality is discovered; gathering, labeling, and preparing evidence; testifying at administrative hearings; and making recommendations to the hearing officer concerning appropriate restitution. *Id.*  This individual may also serve as an expert witness at court proceedings and conduct original inspection and perform periodic program audits of regulated facilities. (*Id.*)

claims that "an investigator" told her to speak with "the law enforcements [sic]."[14] (*Id.*) Plaintiff told this unidentified individual that "they" were required by federal law to provide a sign language interpreter for face-to-face communication.[15]  Plaintiff states that on March 10, 2016, she called the New York State Police in Auburn, New York, and a Sergeant told plaintiff to follow the DMV's instructions. (*Id.*)  Plaintiff also "reported" that her car door lock "pin" was damaged, and that the damage had occurred in December 2015. (*Id.*)

Plaintiff states that early in the morning on March 11, 2016, her car was towed to Fox Honda in Auburn, New York, where plaintiff met defendant Iacona. (Compl. ¶ 15). Defendant Iacona told plaintiff to stay in the hallway while he went into the garage to examine the car. (*Id.* at 10)  Plaintiff states that she observed defendant Iacona and John Doe in her car. (Compl. ¶ 16)  Plaintiff states that John Doe "invaded" her car without her consent, and that this John Doe never met with plaintiff before, during, or after defendant Iacona's investigation. (*Id.*)

Plaintiff alleges that, immediately after his inspection, defendant Iacona stated that "'Harry's Tire already fixed it and it's okay." (Compl. ¶ 17).  Plaintiff refers to this as an "Inaccurate Determination," and states that her car was still on the lift even after defendant Iacona left Fox Honda on March 11, 2016. (*Id.*)  Plaintiff claims that, after

---

[14] It is unclear to what investigator plaintiff is referring, so the court has no idea who told plaintiff to contact "law enforcement."

[15] It is also unclear to whom plaintiff was referring when she says that "they" were supposed to provide a sign language interpreter. (Compl. ¶ 14). The court assumes that plaintiff was complaining to law enforcement officials that the DMV was required to provide a sign language interpreter at defendant Iacona's inspection/examination of her car on March 11, 2016.

defendant Iacona's investigation, defendant Bell sent plaintiff another letter, denying her insurance claim. (Compl. ¶ 18).

Plaintiff claims that "in the middle of March 2016," she followed up with defendant Iacona via the video relay service. (Compl. ¶ 19). Plaintiff states that defendant Iacona told plaintiff that her "complain[t] is all made up and anyone can write it on [the] fly." (*Id.*) Plaintiff states that, despite this statement, plaintiff "attempted to further communicate" with defendant Iacona, but he refused to answer any of plaintiff's questions and hung up. (*Id.*)

Plaintiff states that in March of 2016, she "learned" from two mechanics that "three auto parts within the steering system" needed to be replaced, but that no "complete estimate" had been made. (Compl. ¶ 20). Plaintiff alleges that the "involved employees" at Harry's Tire performed defective repair, conducted a false safety inspection, concealed the defective repair, "granted a false instrument," and caused damage to the car. (Compl. ¶ 21). Plaintiff claims that the "involved mechanic and/or inspector "recklessly failed in his duty of care" and "consciously disregard[ed] [plaintiff's] public safety risk." (*Id.*)

Plaintiff states that in March 2016, she reported defendant Iacona's "inaccurate" finding to defendant Tim Furlong, the DMV Regional Manager, via email and via video relay service. (Compl. ¶ 22). Plaintiff states that defendant Furlong "suspended" defendant Iacona's report. (*Id.*) Plaintiff then states that in April of 2016, defendant Christina Longo, ADA "Designee" for the DMV, told plaintiff that "Mr. Iacona's report is valid." (Compl. ¶ 23). Plaintiff claims that defendant Longo "unreasonably" forced

plaintiff to include her and defendant Iacona in a meeting that plaintiff was going to have with a "qualified investigator" with the "provision of a highly qualified interpreter." (*Id.*)  Plaintiff objected to this, and alleges that this conduct was "Interferences." (*Id.*)

Defendant Longo asked plaintiff where she wanted to meet, and plaintiff suggested Cayuga Community College ("CCC") in Auburn. (Compl. ¶ 24).  However, defendant Longo then demanded that the meeting be relocated to the DMV Regional Office on Taft Road in North Syracuse, N.Y.  (*Id.*)  Plaintiff objected to moving the meeting, but defendant Longo told plaintiff that, if she did not attend, the meeting would be cancelled. (*Id.*)  Plaintiff states that defendant Longo "oppressed" plaintiff's "rights."[16] (*Id.*)

Plaintiff states that she attended the meeting at the DMV Regional Office on May 20, 2016. (Compl. ¶ 25).  Plaintiff claims that a "Jane Doe" "angrily" accused plaintiff of cancelling the interpreter, and left the room without explaining anything to the plaintiff.  When Jane Doe returned to the room, "she simply sat and interrupted [plaintiff] by arm movement," and "apparently recorded [plaintiff] without her consent." (*Id.*)

Plaintiff states that on May 20, 2016,[17] defendant Christopher Ayers, who plaintiff identifies as the Director of Vehicle Safety Field and Consumer Services in

---

[16] This paragraph of the complaint is entitled: "Coercion and Interferences." (Compl. ¶ 24 at 11).

[17] The court can only assume that defendant Ayers attended the May 20, 2016 meeting, although plaintiff does not specifically state that he was present.  She only discusses his behavior on the same date at the DMV Regional Office. (Compl. ¶ 26).

Albany "had a dramatic body language with very negative facial expression." ( Compl. ¶ 26).  In the paragraph entitled "Failure to Act Neutral[ly]," plaintiff states that defendant Ayers "provoked denying all documents, even though he knew of plaintiff's intention to sue Harry's Tire. (*Id.*)  Defendant Iacona was "evasive," and when plaintiff showed him her typed questions, he "declined to answer," and instead, "gestured" toward defendant Ayers. (Compl. ¶ 27).

However, when plaintiff showed the typed questions to defendant Ayers, he "aggressively wrote notes using pencil" and acted "negatively" toward plaintiff. (Compl. ¶ 28).  Defendant Ayers occasionally said something to defendant Iacona, but plaintiff states that she could not hear or understand his words. (*Id.*)  Defendant Ayers selected "a quite [sic] few questions to allow Mr. Iacona to respond."[18] (*Id.*)  Plaintiff claims that defendant Ayers said something to defendant Iacona that plaintiff did not understand, and defendant Iacona went to get "a bulk of pencils" from another room. (Compl. ¶ 29).  Plaintiff states that this conduct made plaintiff "concerned" about the defendants' "intentions." (*Id.*)  Plaintiff claims that defendant Ayers "mocked" that his hand was "hurting" so much.  Plaintiff claims that this "violates [her] equal benefits of participations [sic]." (*Id.*)

Plaintiff stated that she became frustrated and tired because of the defendants' intimidation. (Compl. ¶ 30).  Defendant Ayers was aware that plaintiff was frustrated and asked her about the "physical evidence." (*Id.*)  Plaintiff stated that she "complied"

---

[18] Once again, the court assumes that defendant Ayers was selecting some of the plaintiff's typed questions for defendant Iacona to answer.  In addition, based upon facts stated later in the complaint, it appears that plaintiff is complaining that defendant Ayers only asked defendant Iacona a few of the questions that plaintiff proposed.

with his "inspection request," and instructed the defendants to stay in the room, while she drove her car to the side door of the building. (*Id.*)  Plaintiff claims that defendant Ayers stood still in the area of her car trunk, obstructing her from reaching her sealed evidence box. (Compl. ¶ 30).  Plaintiff alleges that the "Physical Evidence" was "altered" when defendant Ayers took the power steering hose out of "the bag" to inspect it.  He moved "dramatically," pulling pieces of the hose apart.  He then said something to defendant Iacona that plaintiff did not understand and then went back into the building. (Compl. ¶ 31).

Plaintiff alleges when defendants Ayers and Iacona went back into the meeting, they "repositioned their seats," and that defendant Longo, who plaintiff also refers to as Jane Doe, was moving to stand at the "other end of the table." (Compl. ¶ 32).  Plaintiff alleges that, in an attempt to get defendant Ayers to pay attention to her, she "had to apply [her] pressurized speech and mime," when she described an incident at Harry's Tire, during which defendant Riester "aggressively" demanded that plaintiff sign his paper during a business transaction.[19] (Compl. ¶ 33).  Plaintiff states that this "intense effort" at communication with defendant Ayers was "oppressive" because she did not have access to a sign language interpreter.  Plaintiff states that sign language is her right, and an "essential part" of her identity.  Thus, plaintiff's freedom of speech was violated for three hours at the May 20th meeting. (*Id.*)

Plaintiff claims that defendant Ayers ignored her by walking around the table to

---

[19] It is unclear whether plaintiff is referring to the December 3, 2015 incident, during which plaintiff stated that "John Doe aggressively demanded" that plaintiff sign his handwritten notes, or whether the incident that she was describing to defendant Ayers on May 20, 2016 was a different incident. (*Compare* Compl. ¶ 3 *with* Compl. ¶ 33).

stand with "Jane Doe"/defendant Longo. Defendant Ayers's back was turned to plaintiff, blocking plaintiff's view of what he and Jane Doe were doing. (Compl. ¶ 34). Plaintiff alleges that this constituted "Obstruction of Justice," and it prevented her "Equal Benefits to Participate."[20] This conduct allowed defendant Iacona to speak, while plaintiff was not given a fair opportunity to do so. Plaintiff claims that this improper conduct insulted her as a person, and that this "pattern of . . . intimidation[]" caused plaintiff to be fatigued. (*Id.*)

Plaintiff then states that she was "wake" by defendant Ayers turning to face her quickly while she was "sitting and tired."[21] (Compl. ¶ 35 at 14). Defendant Ayers smiled at plaintiff,[22] "mouthed 'my department' and gestured 'me.'" (*Id.*) Plaintiff states that defendants Iacona and Jane Doe/Longo quickly invaded plaintiff's personal space when defendant Longo "closely" came to stand at plaintiff's left side. (*Id.*) Plaintiff states that she became concerned for her personal safety, and that this "pattern of intimidations" "oppress[ed] [plaintiff's] rights." (*Id.*)

Plaintiff must have received an unfavorable decision from this meeting because her next paragraph is entitled "Grievances and Appeal." (Compl. ¶ 36). Plaintiff states that in response to defendant Iacona's determination, she filed a "complaint" in late June 2016." (*Id.*) There is no indiction where she filed her complaint, but she states

---

[20] Plaintiff may also be attempting to assert an "Equal Protection" claim.

[21] Plaintiff actually states that she was "wake by Mr. Ayer's [sic] frontal body swiftly turned toward facing me as I was sitting and tired." (Compl. ¶ 35). Because plaintiff just stated that Mr. Ayers back was to her, the court assumes that perhaps plaintiff dozed off and was awakened when Mr. Ayers turned to face her.

[22] Plaintiff refers to this as Mr. Ayers having a "smile face." (Compl. ¶ 35).

that some of the issues included "public accommodation and determination appeal [sic]." (*Id.*)  Plaintiff states that in July of 2016, she learned for "the first time of a single violation that Harry's Tire had 'willfully improperly repaired,'" but that DMV had only given the company a "warning letter."[23] (*Id.*)  Plaintiff then stated that she then realized that the "personal property"[24] which she brought to the meeting was "missing," and that due to the state defendants "deceptive[] behavior[]," she became ill and was confined to bed through July of 2016. (*Id.*)  Plaintiff states that she has been experiencing emotional distress which has lasted longer than she anticipated. (*Id.*)

Plaintiff alleges that in August of 2016, she told defendant Ayers that her "personal property" was missing, but that she never received a reply. (Compl. ¶ 37). Plaintiff also emailed defendant Furlong to inform him of the missing property, but never received a reply. (Compl. ¶ 37).  Plaintiff notified defendant Furlong that she no longer recognized the "ADA Designee," and asked Mr. Furlong why the meeting was recorded. (*Id.*)  Plaintiff states that she never received a reply to this inquiry. (*Id.*)

Finally, plaintiff claims that she has had increased concerns for her personal safety because her iPhone has been "frozen" several times through 2016, and she was not able to enter activities into her calendar. (Compl. ¶ 38).  Plaintiff claims that her iPhone photo application did not function properly when she attempted to take pictures of defendant Ayers holding her physical evidence on May 20, 2016.  Plaintiff claims

---

[23] This court can only assume that this finding was made in her case.

[24] Plaintiff never states what this "personal property" was or whether it was the "evidence" that she brought to the meeting to sustain her claim.  However, the court assumes that plaintiff is referring to the car parts that she was hoping to use as evidence against Harry's Tire in "court."

that the "disturbances and invasion of privacy" dramatically increased, although the description of these disturbances seems unrelated to plaintiff's complaint. Plaintiff claims that "varied individuals" attempted to "interfere with [her] in public places using negative gestures." (*Id.*) Plaintiff also alleges that a black car with tinted windows followed her at the parking lot, slowly passing by plaintiff and "posting" a "disability signal onto the driver's side tinted window."

Plaintiff reported these concerns to her physical therapist, who allegedly told plaintiff that the DMV "does not care about you." (*Id.*) Plaintiff states that the following week, in September 2016, "a man quickly scooped over [her] in [the] library." Plaintiff claims that she detected "several more incidents" in December of 2015 and in the Fall of 2016. Plaintiff had bad nightmares, and minor property damage. She became very concerned for her personal safely, and these "frequent disturbances affected her heatlh." (*Id.*)

The complaint contains thirty one paragraphs under the heading "Causes of Action." (Compl. ¶¶ 39-69). The court will attempt to list the Causes of Action,[25] with the caveat that plaintiff's references are often confusing, and the court is attempting to match defendants with claims.[26] The complaint contains what appear to be state law

---

[25] The court has combined some of the causes of action that appear to be the same or that involve the same conduct.

[26] As an example, ¶ 3 discussed "Adverse Interference," which the court has interpreted as a claim for "Tortious Interference with Advantageous Business Relations." In ¶ 3, plaintiff states that a "John Doe . . . whom [she] did not know, adversely interfered me [sic] during a business relationship." Then she states that "another John Doe," who she believes to be Mr. Augustine, stood by the counter, while "another" John Doe demanded that she sign his handwritten notes. (Compl. ¶ 3). In plaintiff's cause of action entitled "Adversely [sic] Interference," she never discusses the first John Doe, names Mr. Augustine as the second John Doe, and apparently asserts that defendant Riester is the third John

claims in addition to claims purportedly under the ADA.  The court has interpreted the claims as follows:

(1)    Tortious Interference with Business Relations (Compl. ¶ 39). This claim is asserted against employees of Harry's Tire.

(2)    Disregarding Plaintiff's Safety and a Pattern of Reckless Conducts/RICO[27] (Compl. ¶¶ 40, 41).  This is also a complaint against employees and management of Harry's Tire.

(3)    Financial Burden of "Evidence Preservation" against the DMV. (Compl. ¶ 42).

(4)    "Core Policy"[28] as Deceptive and Unfair Practice/RICO. (Compl. ¶¶ 43, 69). This may be a claim against Harry's Tire.

(5)    Improper acts by defendant State Farm "Before Car Inspection." (Compl. ¶ 44).  State Farm improperly denied plaintiff's "claim" before the DMV had a chance to conduct its investigation of plaintiff's claims against Harry's Tire regarding the improper repair/inspection of plaintiff's vehicle.

(6)    Intentional Infliction of Emotional Distress by defendant Ferlenda from State Farm when he "suspended" plaintiff without explaining his rationale. (Compl. ¶ 45).

---

Doe. (Compl. ¶ 39).  The court can assume this because plaintiff states that "John Doe, assume to be Mr. Riester, adversely interfered" with her and demanded that she sign his handwritten notes. (*Id.*) Thus Riester "interfered" with her rights during a business relationship.  In ¶ 3, plaintiff alleges that the first John Doe interfered with her rights, while in ¶ 39, plaintiff states that the third John Doe, who she identifies as defendant Riester interfered with her rights.  This confusion does not affect this court's ultimate decision that plaintiff does not state a civil rights claim or a supplemental state law claim.

[27] The complaint does not contain a statutory cite for civil RICO, which refers to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

[28] As far as this court can determine, plaintiff is referring to a policy of returning certain automotive parts, known as "cores" to the manufacturer when they are replaced, so that the manufacture may recycle the part. *See e.g.* https://hs-motorsports.com/core-policy.  An item purchased from the manufacturer contains a "core charge," in addition to the listing price.  The core charge is added to the list price, and is refundable when the "core" is returned to the manufacturer.  Thus, if the core is not returned the purchaser loses the amount of the core charge. *Id.*

(7)     Plaintiff alleges that she did not get adequate assistance from Law
        Enforcement, including the Victim/Witness Coordinator at the Cayuga
        County District Attorney's Office. (Compl. ¶ 46).

(8)     The DMV violated the ADA when defendant Iacona asked whether
        someone from plaintiff's family could interpret for her, instead of
        providing a sign language interpreter when Mr. Iacona went to Fox Honda
        to inspect plaintiff's car. (Compl. ¶ 47). Plaintiff was not given an "equal
        opportunity" to participate in the DMV investigation at Fox Honda on
        March 11, 2016 because defendant Iacona "interacted with John Doe who
        had invaded my car property without my consent." (*Id.*)

(9)     State Farm adversely interfered with plaintiff's DMV investigation and a
        John Doe "caused the destruction of evidence preservation," so that "no
        completed estimate" could be made. State Farm defendant Bell denied
        plaintiff's "claim" after the "car investigation." (Compl. ¶ 48).

(10)    Defendant Iacona did not make the proper finding after inspecting the car,
        and as a result, State Farm and defendant Iacona "failed their duties."
        (Compl. ¶ 49). Defendant Iacona insulted plaintiff and refused to answer
        her questions when she was speaking with him "despite the availability of
        an interpreter via video relay service." (Compl. ¶ 50).

(11)    After plaintiff filed a grievance against defendant Iacona, and defendant
        Furlong "suspended" defendant Iacona's report, defendant Longo acted
        "beyond the scope of her employment as ADA designee," when she stated
        that defendant Iacona's report was valid, interfering with plaintiff's rights
        to report a legitimate grievance. (Compl. ¶ 51).

(12)    Defendant Longo interfered with plaintiff's "federal rights," when she
        changed the location of the meeting that was scheduled with the
        investigator and told plaintiff that the meeting would be cancelled if she
        did not attend. (Compl. ¶ 52). Plaintiff alleges that defendant Longo acted
        "beyond the scope of her employment" and "oppressed the fact-finding
        process." (*Id.*)

(13)    Defendant Longo violated the ADA when she asked that she and defendant
        Iacona attend a meeting that plaintiff planned to have "alone" with a
        "qualified investigator" and with a highly qualified sign language
        interpreter." (Compl. ¶ 53). Due to the "change" by her demand, plaintiff

prepared many questions for defendant Iacona, and the sign language interpreter determined that a second interpreter was necessary. (*Id.*) Plaintiff claims that the "meeting was conducted depriving plaintiff of a full and fair opportunity for approximately 3 hours on May 20, 2016," resulting in plaintiff becoming very frustrated and tired. (*Id.*)

(14)    Plaintiff claims that "unqualified" sign language contractors should be "eliminated." (Compl. ¶ 54). Plaintiff claims that the sign language interpreter who was assigned to her May 20, 2016 meeting was "unqualified," and as a result, she did not have "equal benefits of full participation" in the meeting which took place at the DMV Facility in North Syracuse. (*Id.*)

(15)    Invasion of Privacy and ADA. Plaintiff claims that defendant Longo accused plaintiff of cancelling the interpreter for the meeting. Plaintiff claims that she "learned" that "someone" had accessed . . . [her] medical records" (Compl. ¶ 55). Plaintiff claims that "Jane Doe" (maybe defendant Longo) "apparently recorded" plaintiff without her consent, and "engaged in oppressive [sic] environment," violating plaintiff's right to "equal benefits" in the proceeding. (*Id.*)

(16)    Defendant Ayers was not neutral. (Compl. ¶ 56). He "acted out with dramatic body language and unnecessary provoked denying "the documents." (Compl. ¶ 56). Although plaintiff typed questions for defendant Iacona, defendant Ayers "restrictively selected a few questions" for defendant Iacona to answer, thus, depriving plaintiff of her procedural rights. (*Id.*)

(17)    Defendants Iacona and Ayers violated the ADA when they brought pencils into the meeting room, and when defendant Ayers "mocked" that his hand hurt from writing so many notes. (Compl. ¶ 57). Plaintiff claims that she was "excluded from full participation, and that defendants did not give her a full and fair opportunity to be heard. (*Id.*)

(18)    Defendant Ayers "restricted" plaintiff's movement and "altered" her evidence when he asked her for physical evidence and pulled apart the "evidence" that she had sealed in a box in her car. (Compl. ¶ 58). Plaintiff claims that defendant Ayers knew that she was going to use the evidence to take Harry's Tire to trial. (*Id.*)

18

(19)    Plaintiff was required to use "pressurized speech" to get defendant Ayers's attention, and she was not given a fair opportunity to express herself with sign language, which made her very tired.[29] (Compl. ¶ 59).

(20)    "Altered and Missing Documents." Plaintiff noticed "an altered record" on May 20, 2016, and she was not given an opportunity to review defendant Iacona's original report, before, and during the meeting. (Compl. ¶ 60). "Someone" consciously concealed information in order to injure plaintiff's credibility. (*Id.*)

(21)    "Obstruction of Justice and Improper Influence." (Compl. ¶ 61). Defendant Ayers stood in between plaintiff and defendant Longo, so plaintiff could not hear or see what the two defendants were talking about or doing.  They allowed defendant Iacona to speak with them, but plaintiff was not given a fair opportunity to participate. (*Id.*)  Plaintiff seems to allege that there was no "oral record" by plaintiff, but defendant Longo said something different in an email.  Plaintiff alleges that defendant Longo's conduct was a "gross deviation of the ADA Coordinators' roles." (*Id.*)

(22)    "Breach of Duty Owed to Witnesses." (Compl. ¶ 62).  Defendant Ayers failed to perform "his duty," and caused plaintiff emotional distress. (*Id.*)

(23)    Defendants Iacona and Longo invaded plaintiff's personal space by standing too close to her. (Compl. ¶ 63).

(24)    "Highly Offensive Acts." (Compl. ¶ 64).  Plaintiff alleges that defendant Ayers attempted to pressure her into ending the meeting.  Plaintiff also claims that defendant Ayers "right shoulder quickly invaded into [her] frontal chest area on May 20, 2016," and then he quickly moved to the left side of her body. (*Id.*)

(25)    "Determination Appeal." (Compl. ¶ 65).  Plaintiff claims that she only learned in July of 2016 that Harry's Tire had only been guilty of a "single violation," that the company had "willfully improperly repaired," but was only given a "warning" letter by the DMV. (Compl. ¶¶ 36, 65).  Plaintiff seems to allege that defendant Longo acted beyond the scope of her

---

[29] Plaintiff does not allege a specific basis for this claim.  However, the court will assume that plaintiff is referring to the ADA.

employment to deny plaintiff's appeal.  Plaintiff alleges that as a result of this conduct by defendants she has suffered emotional distress. (Compl. ¶ 65).

(26)    Plaintiff was deprived of her personal property by defendant Ayers, who did not respond to her requests to have the property returned to her so that she could use it as evidence against State Farm and Harry's Tire. (Compl. ¶ 66).

(27)    "Gross Deviations by a Licensed Entity." (Compl. ¶ 67).  Plaintiff alleges that Harry's Tire is liable for "causing two separated car incidents," one in 2005 and one in 2015 in order to "retaliate" against plaintiff.  Plaintiff also alleges that the employees of Harry's Tire engaged in a "pattern of improper actions." (*Id.*)

(28)    "An Increased Pattern of Disturbances and Intimidations." (Compl. ¶ 68).  Plaintiff apparently blames many adverse occurrences "through 2016" on these defendants.  These include "stalking," property damage, invasion of privacy, and negative gestures by unknown individuals. (*Id.*)

Reduced to its essence, plaintiff is essentially upset because she believes that Harry's Tire did not fix or inspect her car properly, and that the employees of the DMV did not properly handle the investigation of her complaints against Harry's Tire, and in the process, the DMV discriminated against plaintiff because she is disabled.

The court also notes that plaintiff's Prayer for Relief adds various claims to each of her main claims.  In addition to "failure of investigation," against the State actors, plaintiff also includes a deprivation of freedom of speech, witness intimidation, and unlawful searches and seizures. (Compl. ¶ 70).  Plaintiff also requests that the court "modify" the ADA to "restructure the funding mechanism for face-to-face communication when deaf persons are engaging in any type of industries." (Compl. ¶ 74).  Plaintiff requests a variety of injunctions having to do with the ADA. (Compl.

¶ 76). Finally, although she does not name a defendant in this regard, plaintiff states that she wishes money damages from an "unqualified major contractor, located in Utica, NY."[30] (Compl. ¶ 77).

### III.    <u>Tortious Interference</u>

#### A.    **Legal Standards**

Tortious interference is a state law cause of action. *See Foster v. Churchill*, 87 N.Y.2d 744, 749-50 (1996). The elements of a cause of action for tortious interference with a contract require (a) the existence of a valid contract between the plaintiff and a third party; (b) the defendant's knowledge of that contract; (c) the defendants intentional procurement of a third party's breach of that contract, and (d) damages. *Environmental Services, Inc. v. Recycle Green Svcs., Inc.*, 7 F. Supp. 260, 276 (E.D.N.Y. 2014) (citing *Foster v. Churchill*, 87 N.Y.2d 744, 749-50, (1996); *Chung v. Wang*, 79 A.D.3d 693, 694 (2d Dep't 2010)).

If jurisdiction is not based on diversity of citizenship, state law claims may be brought in federal court if the claim is supplemental to a federal cause of action. *See Sonterra Capital Master Fund, Ltd. v. Credit Suisse Grp., AG*, No. No. 1:15-CV-871, 2017 WL 4250480, at *43 (S.D.N.Y. Sept. 25, 2017) (citations omitted); 28 U.S.C. § 1367(a).[31] The state law claims must be so related to the existing claims within the

---

[30] This appears to be the company which provided allegedly unqualified sign language interpreters.

[31] Section 1367(a) provides:
> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to

court's original jurisdiction that they form part of the same "case or controversy." *Id.* (citation omitted).

## B.    Application

In this case, plaintiff claims that there was "adverse interference" with her business relationship. However, there is no cause of action for "adverse interference." Therefore, the court must attempt to determine what plaintiff might be trying to claim.[32] Even without deciding whether supplemental jurisdiction would be proper, this court finds that plaintiff has failed to state a claim under New York State law for tortious interference with contract. Plaintiff claims that she submitted a hand-written work request to defendant Augustine, which included certain items. (Compl. ¶ 39). However, defendant Riester "adversely interfered" with plaintiff by making her sign his hand-written notes which contained an additional item to be fixed. Plaintiff believes that this action constitutes "adverse interference."

The named defendant is Mr. Riester. At best, even assuming that plaintiff's handwritten work order was a contract, the contract was with defendant Riester as the owner of Harry's Tire, not with a "third party." Plaintiff would have to show that she

---

claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

[32] The Second Circuit has recently restated that the plaintiff's failure to cite a statute or to cite the correct one, in no way affects the merits of the claim. *Cinotti v. Aldeman*, No. 16-1804, slip op. at 3 (2d Cir. Sept. 15, 2017) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 199 n.2 (2d Cir. 2004)). The court finds that the same applies for common law causes of action because a pro se complaint is to be read to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

had a contract with a third party, and that defendant Riester caused the third party to breach a contract with plaintiff. Plaintiff has not established any of the elements of tortious interference with contract. At best, she is unhappy because she presented defendant Augustine with a work order that either defendant Augustine or defendant Riester changed by adding an item that plaintiff believed did not need fixing, and defendant Riester "forced" plaintiff to sign "on his handwritten notes."[33] Plaintiff's claim of "adverse interference" may be dismissed.

## IV.    RICO

### A.    Legal Standards

In order to establish a violation of the RICO statute, 18 U.S.C. § 1962(c), a plaintiff must show "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *DeFalco v. Bernas*, 244 F.3d 286, 305–06 (2d Cir. 2001) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) and citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d 229, 242 (2d Cir. 1999); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994)). These must be established as to each individual defendant. *Id.* (citing *United States v. Persico*, 832 F.2d 705, 714 (2d Cir.1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d).))

The terms "enterprise," "racketeering activity," and "pattern of racketeering activity" are defined in 18 U.S.C. § 1961. A RICO enterprise "includes any individual,

---

[33] It is a little unclear whose notes plaintiff was "forced" to sign. Essentially, plaintiff alleges that she was forced to fix something that she believed did not need fixing.

partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" is broadly defined to encompass a variety of state and federal offenses including, inter alia, murder, kidnaping, gambling, arson, robbery, bribery and extortion. *See* 18 U.S.C. § 1961(1). A " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

In essence the civil plaintiff must establish that the defendant violated the criminal RICO statute. *Wood v. General Motors Corp.*, No. 08-CV-5224, 2015 WL 1396437, at *3 (E.D.N.Y. Mar. 25, 2015) (citing 18 U.S.C. § 1962; *Moss v. Morgan Stanley*, 713 F.2d 5, 17 (2d Cir. 1983)).  In addition, the racketeering activities must be related and "pose a threat of continuing criminal activity." *Tooker, supra.*  These include the crimes listed above, and other crimes, "'chargeable under State law and punishable by imprisonment for more than a year.'" *Id.* (citations omitted).

## B.    Application

In this case, plaintiff has simply added the words, or words similar thereto: "Alternatively RICO has been violated" to some of the paragraphs of her complaint. (Compl. ¶¶ 40, 41, 43).  At the end of her complaint, plaintiff has included a paragraph, entitled "RICO Statement." (Compl. ¶ 69).  Plaintiff claims that the mechanics and inspectors at Harry's Tire were liable for a "pattern of misconducts," which involved improperly fixing her car and "granting a false certificate of safety inspection sticker,

24

and/or conceal[ing] the defective repair." (Compl. ¶ 41).

None of the conduct that plaintiff alleges rises to the level of a RICO violation. Even if the mechanics at Harry's Tire improperly fixed plaintiff's car, resulting in an inspection sticker being issued prematurely or even improperly, there is no indication of any "racketeering" activity.  Plaintiff returned to Harry's Tire on December 4, 2015 to explain that there was a problem with her car, and that the work was not properly done. Plaintiff alleges that defendant Augustine found a "loose clamp," but plaintiff "objected based on varied abnormal sensations. (Compl. ¶ 5).  As stated above, "racketeering activities" must be state or federal "offenses."[34]  Disagreement over what needs to be fixed on a car or event negligent repair does not rise to the level a state or federal offense.

Plaintiff states that she has always had her car fixed by Fox Honda, and that she went to Harry's Tire because she declined Fox Honda's service.  Although it appears from plaintiff's complaint that this was the first time she took her automobile to Harry's Tire, she also states that she dealt with defendant Riester in 2005, when plaintiff previously made a complaint to the DMV. (Compl. ¶¶ 2, 6).  It is unclear what happened in 2005, but the RICO statute requires that the acts of "racketeering activity" must occur within ten years of each other, and if they involve fraud, they must be stated with particularity. *Tooker v. Guerrera*, No. 15-CV-2430, 2017 WL 3475994, at *9-10 (E.D.N.Y. Aug. 11, 2017).  Plaintiff in this case has absolutely no basis for asserting a

---

[34] The predicate crimes are listed in 18 U.S.C. § 1961(1) and include mail fraud and wire fraud. *See Mathon v. Marine Midland Bank*, 875 F. Supp. 986, 995 (E.D.N.Y. 1995).  A party asserting mail fraud must comply with the heightened pleading standard contained in Fed. R. Civ. P. 9(b). *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 273, 293-94 (E.D.N.Y. 2013) (citation omitted).

pattern of violations under RICO against Harry's Tire on the facts of this complaint.[35]

Plaintiff also alleges that the "Core Policy" violates RICO "on a regular basis." (Compl. ¶ 69). The "Core Policy," as stated above, is a policy by which automotive parts are sold, not unlike the deposit that one pays on a soda bottle. When the bottle is returned, the deposit is payed back. If the bottle is not returned, the purchaser loses the amount of the deposit. The automotive policy encourages the recycling of materials and the proper disposal of parts. Plaintiff alleges that she was not allowed to keep her old parts without incurring a charge pursuant to this policy. Plaintiff wished to keep her rear caliper as evidence that it was not necessary to be replaced in order for the car to pass inspection. (Compl. ¶ 69). Plaintiff states that she "suspect[s] possible frauds behind the deceptive norm of core policy." (*Id.*) Plaintiff claims that she relied on defendant Iacona's "investigative expertise," but that he was "evasive," preventing plaintiff from "knowing whether deliberate opportunistic breaches have occurred on a regular basis." (*Id.*) The closest predicate act that plaintiff could be alleging is fraud. A necessary element of a scheme to defraud under the federal fraud statutes is the making of a false statement or material misrepresentation, or the concealment of a material fact. *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003) (citing, inter alia, *Neder v. United States*, 527 U.S. 1, 25 (1999)). *See also Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169-70 (2d Cir. 1999) (discussing mail fraud);

---

[35] A plaintiff's burden is quite high when pleading civil RICO claims. *Wood*, 2015 WL 1396437, at *3. In *Wood*, the court stated that "'Courts look with particular scrutiny at claims for a civil RICO, given the statute's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies.'" *Id.* (quoting *Spiteri v. Russo*, No. 12-CV-2780, 2013 WL 4806960, at *45 (E.D.N.Y. Sept. 7, 2013)).

*Boneta v. Rolex Watch, Inc.* 232 F. Supp. 3d 354, 358-59 (S.D.N.Y. 2017) (discussing the elements of a RICO fraud claim).

In this case, plaintiff's allegations are vague, and plaintiff's claims of fraud are speculative and anything but specific. Plaintiff seems to allege that this policy itself improperly enriches the parts manufacturer and/or repair shop, but it is not clear what RICO enterprise is alleged. Plaintiff asks that "all repair services and involved businesses" compensate her for their "gains, and/or profits" that they generated from her "personal property" since plaintiff has owned her automobile. (*Id.*) First, none of the defendants are parts manufacturers or are responsible for the Core Policy,[36] and in any event, there is no indication that such a policy amounts to "a crime" for purposes of the RICO statute. Plaintiff does not state that she was mislead or that the Core Policy is somehow "false," or that she relied upon a defendant's statement or policy to her detriment. She simply wanted to keep her old auto parts without incurring the deposit fee. She may not agree with the policy, and it may have prevented her from keeping an old car part, but there is no fraud involved with this conduct. Thus, plaintiff's RICO claims may be dismissed.

## V.    Section 1983

### A.    Legal Standards

Plaintiff has filed this case, using a form for civil rights actions under 42 U.S.C. § 1983. To state a claim under section 1983, the plaintiff must allege both that the defendant has violated plaintiff's rights under either the Constitution or laws of the

---

[36] Plaintiff does not allege otherwise.

27

United States and that the defendant acted "under color of state law." *Rae v. City of Suffolk*, 693 F. Supp. 2d 217, 223 (E.D.N.Y. 2010); 42 U.S.C. § 1983.

A person acts under color of state law when he or she acts in his or her official capacity, "clothed with the authority of state law," or acts under "pretense" of law by purporting to act with official power. *Pleasure Island, Inc. v. City of New York*, No. 12 Civ. 4699, 2013 WL 2311837, at *5-6 (E.D.N.Y. May 24, 2013) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). The requirement that the defendant acted under "color of state law" is jurisdictional. *Lucas v. Riggi*, No. 07-CV-6200, 2008 WL 4758706, at *2 (W.D.N.Y. Oct. 29, 2008) (citing *Polk County v. Dodson*, 454 U.S. 312, 315 (1981)). Private conduct is simply beyond the reach of section 1983 "'no matter how discriminatory or wrongful" that conduct may be." *Id.* (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)). A private party may act under color of state law if he or she engages in conduct that constitutes willful participation in joint activity with the state. *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam). The nexus to the state must be so close as to be fairly treated as that of the state itself. *Tancredi v. Metro Life Ins. Co.,* 316 F.3d 308, 312 (2d Cir. 2003) (citations omitted).

The actions of a nominally private entity are attributable to the state when:

(1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ('the compulsion test'); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate,' or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

28

*Sybalski v. Independent Group Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Academy v. Tennessee*, 531 U.S. at 296) (brackets in original)).

### B.    Application

#### 1.    State Farm, Bell, and Ferlenda

Plaintiff has sued State Farm Insurance Company, Roger Bell (Team Member), and Tom Ferlenda (Agent).  Neither the company, nor its employees act "under color of state law."  Plaintiff does not allege otherwise.  Plaintiff is upset with State Farm, Bell, and Ferlenda because the company denied her insurance claim before the DMV had a chance to conduct its investigation of plaintiff's complaints against Harry's Tire regarding the improper repairs/inspection.  Plaintiff also claims that defendant Ferlenda intentionally inflicted "emotional distress" upon plaintiff when he "suspended"[37] plaintiff without explanation. (Compl. ¶¶ 44-45). Plaintiff also alleges that State Farm "interfered with" the DMV investigation, and a "John Doe," invaded her "car property" without plaintiff's consent and caused the destruction of "evidence" so that no completed estimate could be made, and defendant Bell denied plaintiff's claim ***after*** the DMV "investigation."[38] (Compl. ¶ 48).

---

[37] Plaintiff never explains what she means by "suspended" in this context because it is not relevant to this court's decision.  The court will not speculate as to the meaning.

[38] The court would first point out that this allegation is inconsistent with the statement plaintiff makes that State Farm denied her claim "before" the DMV had a chance to investigate. (Compl. ¶ 44). This court has interpreted plaintiff's claim as raising the issue of negligent or intentional spoliation of evidence.  This cause of action is based in state law. *See Alegria v. Metro Metal Products, Inc.*, 20 Misc. 3d 591, 594-96 (S. Ct. Kings Cty. 2010) (discussing spoliation).  A claim of spoliation has been utilized when the destruction of evidence is related to an ongoing lawsuit. *See Tomkins v. Armstrong*, 7 Misc. 3d 311, 313 (S. Ct. Kings Cty. 2005).  However, New York does not recognize a general duty to

State Farm is a private entity, and there are absolutely no allegations that would establish a conspiracy with state officials or any other allegations establishing state action by the State Farm defendants.[39]  Thus, any claims against State Farm Insurance and its employees may be dismissed. (Compl. ¶¶ 44-45, 48, 49).

## 2.    Harry's Tire

Harry's Tire is also a private company.  Plaintiff alleges that Harry's Tire acted under color of state law because the State of New York regulates auto repair/inspection establishments, and inspections are conducted pursuant to New York State law. Plaintiff alleges "gross deviations by a licensed entity." (Compl. ¶ 67)  It has been held that licensing by the state alone does not render the licensee a state actor. *White v. St. Joseph's Hospital*, 369 F. App'x 225, 226 (2d Cir. 2010).

> [A] private entity does not become a state actor for purposes of § 1983 merely on the basis of the private entity's creation, funding, licensing, or regulation by the government.  Rather, there must be such a close nexus between the [s]tate and the challenged action that the state is *responsible* for the specific conduct of which the plaintiff complains.

---

preserve evidence as an independent tort. *Alegria*, 20 Misc. 3d at 594-96 (citing *MetLife Auto & Home v. Joe Basil Chevrolet*, 1 N.Y.3d 478, 480-81 (2004)).  In any event, a cause of action for spoliation would also require diversity jurisdiction which is lacking in this action.  Plaintiff also alleges a potentially related cause of action against the DMV as a "supplemental" claim to any section 1983 causes of action. (Compl. ¶ 42). The court will discuss this claim as relates to the DMV below.

[39] Diversity jurisdiction under 28 U.S.C. § 1332 is not available in this case.  Although State Farm is listed as an Illinois company, and defendant Bell appears to be from Arizona, diversity jurisdiction requires that ***all defendants*** must be of diverse citizenship in addition to requiring a jurisdictional threshold of $75,000.00 in damages. *Greene v. Paramount Pictures Corp.*, No. 14-CV-1044, 2017 WL 4011240, at *2 (E.D.N.Y. Sept. 11, 2017) (citation omitted).  Even assuming that some of the defendants are of diverse citizenship to plaintiff, there are several defendants whose citizenship for jurisdictional purposes is New York.  Thus, plaintiff cannot raise any claims that would require diversity of citizenship as a jurisdictional basis.

*Rose v. City of Waterbury*, No. 3:12-CV-291, 2013 WL 1187049, at *5 (D. Conn. Mar. 21, 2013) (emphasis in original some alterations in original) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).

In the case of Harry's Tire, it is undisputed that the state licenses and regulates the businesses which perform New York State inspections, but the state is not *responsible* for the inspection. The mere licensing and regulation of New York State inspection facilities does not render them state actors. In addition, plaintiff appears to conflate her "inspection" with other repairs that she had done to the automobile which apparently were not done properly. There is an insufficient nexus between Harry's Tire and the State of New York to find that Harry's Tire acted under color of state law.[40] Any claims against Harry's Tire may be dismissed.

## VI.    Assistance from Law Enforcement/DMV

### A.    Legal Standards

---

[40] In any event, even assuming that Harry's Tire somehow acted under color of state law with respect to plaintiff's "inspection," there is no indication that plaintiff was deprived of a constitutional right. As stated above, plaintiff alleges "gross deviations" by a licensed entity. Plaintiff claims that Harry's Tire was responsible for her "incidents." The "incidents" that plaintiff describes did not cause an accident, and plaintiff was able to bring the car back to Harry's Tire so that the car could be fixed. There is no constitutional right to have one's car fixed properly. While there may be state law repercussions, sounding in tort, plaintiff has cited no constitutional violations as the result of the actions by Harry's Tire. The fact that plaintiff may have been without her car for a period of time is due to her own complaint to the DMV, whose employees apparently told plaintiff not to move or use the car until it could be "inspected" by the DMV investigator. In fact, plaintiff herself blames the DMV for its delay in inspecting the car, allegedly causing the financial burden of "Evidence Preservation." Harry's Tire did not deprive plaintiff of her property. Plaintiff also claims that Harry's Tire and its employees "disregard[ed] [plaintiff's] safety." (Compl. ¶¶ 40, 41). This statement does not cite any constitutional provision or protection. Finally, plaintiff claims that the 2015 "incidents" are somehow related to plaintiff's 2005 issues with Harry's Tire because defendant Riester mentioned that he remembered plaintiff from 2005. However, Mr. Riester's comment was made after the plaintiff's car was inspected by Harry's Tire, and the prior "incident" was ten years prior. There are absolutely no facts that would support any claim of "retaliation." Plaintiff may not turn alleged state law violations into constitutional claims by simply bringing an action purportedly under section 1983.

Plaintiff has no constitutional right to an investigation of any sort by government officials. *See Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008); *Lewis v. Gallivan*, 315 F. Supp. 2d 313, 317 (W.D.N.Y. 2004) (citing cases). In order for a constitutional violation to have occurred, the investigation itself must have resulted in the deprivation of a constitutional right. *Faison v. Hash*, 03-CV-6475P, 2004 WL 944523, at *6 (W.D.N.Y. April 23, 2004) (citation omitted). The exception exists when the failure to investigate is based on improper motives - race, gender, or disability. *Walker v. City of New York*, No. 05-CV-1283, 2010 WL 5186779, at *5 (E.D.N.Y. Dec. 15, 2010). The Government may not "selectively" deny its protective services to disfavored minorities without violating the Equal Protection Clause. *Id.* However, the fact that plaintiff is disabled is not, by itself indicative of an improper motive. Rather, she must show that other, similarly situated individuals were treated differently. *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011).

### B.    Application

#### 1.    Law Enforcement

In this case, plaintiff alleges that she did not get adequate assistance from law enforcement, including the Victim/Witness Coordinator ant the Cayuga County District Attorneys Office.[41] (Compl. ¶ 46). The court first notes that plaintiff has not named anyone who she alleges failed to give her "adequate assistance." In any event, even if

---

[41] This court will assume that individuals working for the Cayuga County District Attorneys office work under color of state law. However, plaintiff does not state a constitutional claim, nor does she sue any specific defendants. Thus, the court may dismiss the claim on both bases.

plaintiff had named a responsible defendant, she has no constitutional right to an "investigation" of any kind. *Berstein, supra.* In addition, plaintiff does not specify to what she believed she was entitled,[42] or that the failure to "assist" or "investigate" was motivated by any type of discrimination. In any event, plaintiff does not even allege that any of the defendants violated any criminal laws. It is unclear what plaintiff wished law enforcement to investigate. Thus, any such claim may be dismissed.

### 2.    DMV Defendants

Plaintiff also seems to allege that the DMV investigation was not adequate[43] and that defendants Ayers, Iacona, and Longo "obstructed justice," destroyed evidence, and "someone" altered records, and "concealed information to injur[e plaintiff's] credibility." (Compl. ¶¶ 60-61). As a result, "someone" breached "standard practice." (Compl. ¶ 60). Plaintiff does not specify what records were "altered" or how they were altered. Plaintiff also does not specify what information was "concealed" or why that would injure plaintiff's credibility. Conclusory allegations such as these do not state civil rights claims. *See Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (conslusory allegations are insufficient to state a constitutional claim).

Plaintiff also blames the DMV because she incurred a "financial burden" to preserve her "evidence." (Compl. ¶ 42). It appears from other comments in the

---

[42] To the extent that plaintiff is attempting to allege that there should have been some prosecution by law enforcement officials, it is well settled that no private citizen has a constitutional right to bring a criminal complaint against another individual. *Lewis v. Gallivan*, 315 F. Supp. 2d at 316-17 (citation omitted).

[43] To the extent that plaintiff alleges ADA violations as a result of the investigation, these claims are discussed separately below.

complaint that plaintiff was told not to use the car, pending the DMV's investigation, but that it took longer than plaintiff anticipated. This resulted in plaintiff incurring expenses in order to use public transportation so that she could "preserve" the evidence. Plaintiff is not entitled to any kind of an investigation, and the fact that she had to "preserve" her evidence is not the fault of the DMV, certainly not a constitutional violation by the DMV.[44]

Plaintiff states that she was not allowed to look at defendant Iacona's "original" report, before, during, or after the hearing. (*Id.*) Plaintiff alleges that defendant Ayers was not "neutral," and that he denied plaintiff unspecified documents. When plaintiff told defendant Ayers that she was going to take Harry's Tire to court, and showed defendant Ayers "typed" questions, defendant Ayers "acted out" by writing notes back to plaintiff and choosing only certain questions to ask defendant Iacona. (Compl. ¶ 56).

These allegations all appear to relate to an attempt to state a due process claim.[45] Procedural due process requirements are triggered when a liberty or property interest is at stake. *In re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016) (citations omitted). Once due process is triggered then the "question becomes what process is

---

[44] In fact, the DMV website specifically states that "[d]epending on the complaint, this process can take several weeks to several months to resolve." https://dmv.ny.gov/contact-us/report-problem-dmv-regulated-automotive-business.

[45] A plaintiff who has been denied state-protected services may potentially assert a section 1983 claim under both Equal Protection and Due Process. *Patterson v. City of New York*, No. 16-CV-3525. 2017 WL 3432718, at *12 (E.D.N.Y. Aug. 9, 2017). However, to establish an Equal Protection violation, plaintiff must show that the defendant intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected class. *Id.* The claim is similar an ADA claim as the court will discuss below. In this case, plaintiff does not allege that other similarly situated individuals were treated differently than she was treated, sufficient to state an equal protection claim.

due." *Id.* (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1971)).  In this case, plaintiff initiated the complaint with the DMV against Harry's Tire, thus, the hearing was not protecting plaintiff's property or liberty interest from being impaired by a state actor.

In any event, the essence of due process is notice and an opportunity to be heard. *Id.*  In this case, plaintiff complains bitterly about the conduct of the hearing that was afforded to her.  She claims that defendant Ayers did not ask all the questions that plaintiff had prepared for defendant Iacona.  However, plaintiff does not allege that there were particular questions that she was not able to ask that would have made a difference to her complaint.  There is no right to ask unlimited questions at any hearing. Plaintiff asserts vague claims against the defendants for moving around the room and for depriving her of multiple or "qualified" sign language interpreters.  Plaintiff's disagreement with the methods that the DMV used to investigate plaintiff's complaint against Harry's Tire, and her disagreement with the outcome of the investigation do not state civil rights claims.

### 3.    State of New York

It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3.  Immunity from suit under the Eleventh Amendment extends to State agencies and departments. *Burnette v. Carothers*, 193 F.3d 52, 57 (2d Cir. 1999). Thus, to the extent that plaintiff is attempting to bring a section 1983 action for

damages against the State of New York, the complaint may be dismissed with prejudice.

## VII.   **ADA Claims**

### A.    **Legal Standards**

The ADA contains three titles: Title I relates to discrimination in employment (42 U.S.C. § 12112(a)); Title II relates to public services and public entities (42 U.S.C. § 12132); and Title III reaches discrimination by public accommodations and services operated by private entities (42 U.S.C. § 12182). The only title applicable to plaintiff's claims against the DMV would be Title II because the DMV would be considered a public entity.

To prove a violation of Title II, the plaintiff must establish that she is a qualified individual with a disability, that she was excluded from participating in a public entity's services, programs or activities or was otherwise discriminated against by a public entity, and that the exclusion or discrimination was due to disability. *Klaes v. Jamestown Bd. of Public Utilities*, No. 11-CV-606, 2013 WL 1337188, at *12 (W.D.N.Y. Mar. 29, 2013) (citing *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003)).

### B.    **Application**

Plaintiff filed a claim with the DMV to report Harry's Tire, based upon the incidents in December of 2015. The DMV has a procedure by which complaints may be made against a "regulated automotive business," which includes "all repair shops, inspection stations, dealers, junk and salvage vendors, and other automotive related

businesses in New York State." https://dmv.ny.gov/contact-us/report-problem-dmv-regulated-automotive-business.  The procedures are clearly specified on the DMV website.  The DMV also has a policy of affording access to its programs, services, or activities to persons with disabilities.  The policy includes a grievance procedure by which individuals who believe that this policy has been violated may complain.

In this case, plaintiff states that she is hearing impaired.  She alleges that she filed a complaint with the DMV against Harry's Tire, and that defendant Iacona was assigned to investigate the problem.  However, plaintiff alleges that defendant Iacona violated the DMV's ADA policy when he asked plaintiff if she had a family member who could interpret for her March 11, 2016, when Mr. Iacona went to inspect her car.  Plaintiff claims that she was not given an "equal opportunity" to participate in the investigation on March 11, 2016 because defendant Iacona spoke with an individual in the garage at Fox Honda, while plaintiff was told to wait in the hallway.

The fact that plaintiff had to wait in the hallway, while defendant Iacona went to examine plaintiff's car in the Fox Honda garage had nothing to do with plaintiff's disability.  The John Doe was presumably an employee of Fox Honda and not one of the defendants from Harry's Tire.  Based on the allegations in plaintiff's complaint, it is also clear that plaintiff was later afforded a hearing[46] regarding her complaint against Harry's Tire.

Plaintiff alleges that her "rights" were "oppressed" when the DMV changed the

---

[46] In her complaint, plaintiff refers to this as a "meeting," but it appears to be a meeting/hearing at which decisions were made about plaintiff's complaint to the DMV about Harry's Tire, with defendant Ayers as the decision-maker, based upon defendant Iacona's investigation/report.

location of her hearing and told her that she was required to attend or the "meeting" would be canceled. Changing the location of the meeting did not deprive plaintiff of access to the DMV program and was not based on plaintiff's disability. Plaintiff claims "interferences" because defendant Longo told plaintiff that defendant Iacona would be allowed to attend plaintiff's meeting with a "qualified investigator with provision of a highly qualified interpreter." (Compl. ¶ 23). Allowing the investigator from DMV and the ADA coordinator to attend plaintiff's meeting does not deny plaintiff access to the DMV program, and plaintiff does not allege that the investigator would not regularly be allowed to attend the hearing.

The meeting/hearing took place on May 20, 2016. None of the conduct alleged by plaintiff states a claim under the ADA or the constitution. In order to state a claim under the ADA, plaintiff must allege that she was *excluded from participating* in a public entity's services, programs or activities or was otherwise discriminated against by a public entity, and that the exclusion or discrimination was due to disability. Plaintiff was not excluded from participating in the DMV's complaint procedures, nor was she excluded from participating in the hearing. Plaintiff was not satisfied with the result of the hearing, she believed that the defendants' facial expressions were negative, and that they were making fun of her because they had to write out questions or take notes. It does not appear that plaintiff was denied a qualified sign language interpreter, even though some of the paragraphs of the complaint seem to imply that she was denied an interpreter at the hearing. Instead, plaintiff alleges that the interpreter who was provided was not to her liking and was not qualified to perform the extent of

interpretation required.[47]  Plaintiff also complains that defendants Longo, Ayers, and Iacona moved about the meeting room and "repositioned their seats." (Compl. ¶ 32). Plaintiff also claims that, at one point during the meeting, defendant Ayers moved around the table, and had his back to plaintiff, blocking her view of what defendants Longo and Ayers were doing.

Plaintiff also claims that defendant Ayers "tampered" with plaintiff's physical evidence by taking the power steering hose from plaintiff's "sealed" evidence box and pulling pieces apart.  The court must point out that in order for the DMV to know whether an automotive business has been violating consumers' rights, the investigators may need to look at the parts that the car owner alleges were improperly handled or improperly fixed or inspected.  Defendant Ayers's handling plaintiff's evidence had nothing to do with her disability, and thus, plaintiff does not state an ADA claim as a result.

Plaintiff claims that defendant Longo "apparently recorded" plaintiff without her consent, engaged in an "oppressive environment on May 11, 2016, and "failed" in her "duty as an ADA designee." (Compl. ¶ 55).  Plaintiff alleges that defendant Longo acted "beyond the scope" of her ADA responsibilities when she told plaintiff that defendant Iacona's report was "valid." (Compl. ¶ 52).  Plaintiff claims that this

---

[47] Plaintiff states that when defendant Longo insisted that she and defendant Iacona attend a meeting that plaintiff wished to have "alone" with a highly qualified sign language interpreter, plaintiff "prepared asking a lot of questions to Mr. Iacona," and the sign language interpreter determined that two sign language interpreters were required. (Compl. ¶ 53).  "As a result the meeting was conducted depriving a fair and full opportunity for approximately 3 hours on May 20, 2016." (*Id.*)  The complaint is very vague and difficult to understand, but it appears that plaintiff is simply unhappy with the extent of assistance that she received from the DMV employees and from the DMV's ADA coordinators.

interfered with her ability to report a grievance. (*Id.*)  Plaintiff's assertions are vague, and do not state claims under either the ADA or the constitution.

Finally, the court notes that individuals cannot be held liable under the ADA. *Baross v. Greenlawn*, No. 16-CV-4805, 2017 WL 2124424, at *4 (E.D.N.Y. May 15, 2017) (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (holding that Title II of the ADA does not provide for suits against individuals); *Fox v. State Univ. of N.Y.*, 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007) ("[T]here is no individual liability under Title I or Title II of the ADA, or the ADEA."); *Sutherland v. New York State Dep't of Law*, No. 96 Civ. 6935, 1999 WL 314186, at *7 (S.D.N.Y. May 19, 1999) ("Individual defendants may not be held personally liable for alleged violations of the ADA . . . .").

Thus, although plaintiff may name New York State or the DMV as  defendants under Title II of the ADA, she may not name the state defendants in their ***individual*** capacities.  Thus, to the extent that plaintiff attempted to assert a claim for damages under the ADA, she may not name defendants Ayers, Iacona, Longo, or Furlong in their "individual capacities," and the ADA claims may be dismissed as against these defendants with prejudice.

## VIII.  Miscellaneous Claims

Plaintiff has included miscellaneous claims that she apparently believes are related to her complaint.  As stated above, in conclusory fashion, plaintiff has asserted that unknown individuals are "stalking" her and making negative gestures toward her. Plaintiff has not asserted that any of the defendants committed any specific act to which

she refers, and all such conclusory allegations may be dismissed. *See Warner v. Mandell*, No. 3:15-CV-807, 2015 WL 5827668, at *4 (N.D.N.Y. Oct. 6, 2015) ("[C]omplaints relying on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.") (quoting *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987)).

In her "Prayer for Relief," plaintiff has listed a variety of claims, including unlawful search and seizure, negligent hiring of defendant Iacona, and "adverse inferences toward [plaintiff] as a government witness." (Compl. ¶ 70). Plaintiff also alleges deliberate failure of "disclosures," and intentional concealment. Although some of plaintiff's allegations correspond to claims that she made in the body of the complaint, some are completely unrelated. In addition, some of the claims made in the body of the complaint do not specify which defendant was responsible for the alleged conduct. Thus, none of the plaintiff's additional and miscellaneous allegations state plausible claims for relief under any civil rights statute as the complaint is written.

## IX.    Opportunity to Amend

### A.    Legal Standards

Generally, when the court dismisses a pro se complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with

plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

### B.    Application

In this case, it is questionable that plaintiff will be able to cure the defects in her pleading.  No attempt at amendment will revive a RICO claim, and there are no supplemental state law claims that have been stated under the facts in this case. However, the court recommends that she be given an opportunity to amend the claims under the ADA relative to the DMV or New York State only, not against any of the individual DMV defendants.  Based on the facts stated, plaintiff will also be unable to state claims against the private automotive repair company or against plaintiff's insurance company under section 1983, and plaintiff does not allege ADA claims against the private entities or individuals.

### X.    Appointment of Counsel

### A.    Legal Standards

There is no bright-line test for determining whether counsel should be appointed on behalf of an indigent party.  *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997).  A number of factors must be carefully considered by the court in ruling upon the motion.  The court must first assess whether the indigent's claims seem likely to be of substance.  If so, the court then considers:

> [t]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting

*Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)).  Each case must be decided

on its own facts, and the court may consider any or all of the above factors in its

determination. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy,

C.J.) (citing *Hodge*, 802 F.2d at 61).

### B.    Application

Plaintiff has indicated in her motion for appointment of counsel that she has

contacted multiple attorneys who have refused to take her case.  Based upon a thorough

review of the complaint, this court finds that most of plaintiff's complaint may be

dismissed with prejudice.  To the extent that the court is recommending dismissal with

leave to amend, it is premature to determine whether the complaint will have substance,

sufficient to continue with the appropriate analysis for appointment of counsel.  Thus,

the court will deny plaintiff's motion without prejudice to renewal, when and if, the

court approves this recommendation, plaintiff files an amended complaint, and the

court has had an opportunity to review it.

## XI.   Sealing

### A.    Legal Standards

As the Second Circuit has stated, "[t]he common law right of public access to

judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of

Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (citing *United States v. Amodeo*, 44 F.3d

141, 145 (2d Cir. 1995) (*Amodeo I*)).  Before this right attaches, however, the court

must conclude that the documents at issue are "judicial documents," which are those

that are "'relevant to the performance of the judicial function and useful in the judicial process.'" *Id.* (quoting *Amodeo I, supra*). Once the documents are determined to be judicial documents, and the presumption of access attaches, then the court must consider the weight of that presumption by determining the role of the materials at issue in the exercise of judicial power and the resulting value of such information to those who monitor the federal courts. *Id.* (citing *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) (*Amodeo II*)). Where the particular document or documents are usually filed with the court and are "generally" available, the weight of the presumption is stronger than when a document is generally filed under seal. *Amodeo II*, 75 F.3d at 1050.

The court considers privacy interests of "third" parties and the degree to which the subject matter is traditionally considered private. *Lugosch*, 435 F.3d at 120; *Amodeo II*, 75 F.3d at 1051 (citations omitted). Motions to seal must be "'carefully and skeptically review[ed] . . . to insure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Under Seal v. Under Seal*, No. 16-CV-7820, 2017 WL 3432720, at *3 (S.D.N.Y. Aug. 10, 2017) (citing *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)). Documents may be sealed if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Fitzpatrick v. American Internat'l Grp.*, No. 10 Civ. 142, 2012 WL 4378098, at *1 (S.D.N.Y. Sept. 24, 2012) (citation omitted).

44

## B.    Application

In this case, plaintiff asked the Clerk of the Court to "seal" the entire action. Plaintiff filed a "motion to seal," and in an abundance of caution, the Clerk sealed the documents without consulting any judicial officer. (Dkt. No. 5).  However, having reviewed the documents, together with plaintiff's letter, the court finds no basis for sealing.  Plaintiff states that she wishes the court to seal the case because she has had "frequent disturbances," which include "stalking."  She does not want the public to know her name because she has been on a long road to recovery and does not wish to experience any more retaliation. (*Id.*)

Although plaintiff seems to believe that she has been the subject of "stalking" and "retaliation," she has only asserted vague and conclusory statements as her basis for these assertions.  Plaintiff has interpreted every mishap which has befallen her since the incidents of which she complains as "stalking" or "retaliation."  These include "negative gestures" by unknown individuals, a "frozen" iPhone, and being followed by a black car with "tinted" windows. (Compl. ¶ 38).  Plaintiff's allegations have no basis in fact, and I will order that the case be unsealed prior to dismissal.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's application to proceed IFP (Dkt. No. 2) is **GRANTED FOR PURPOSES OF FILING ONLY**, and it is

**ORDERED**, that plaintiff's motion for appointment of counsel (Dkt. No. 3) is **DENIED**, and it is

**ORDERED**, that the plaintiff's motion to seal (Dkt. No. 5) is **DENIED**, and the

Clerk is directed to **UNSEAL THIS ACTION**, and it is

      **RECOMMENDED**, that this complaint be **DISMISSED WITH PREJUDICE**

pursuant to 28 U.S.C. § 1915(e)(2)(B)(i-ii) for failure to state a claim as against

defendants **3RPM, INC. d/b/a HARRY'S TIRE; AUGUSTINE; RIESTER;**

**FERLENDA; BELL; and STATE FARM INSURANCE**, and it is

      **RECOMMENDED**, that the complaint be **DISMISSED WITH PREJUDICE**

pursuant to 28 U.S.C. § 1915(e)(2)(B)(i-ii) for failure to state a claim as against

defendants **AYERS; IACONA; FURLONG; and LONGO IN THEIR**

**INDIVIDUAL CAPACITIES**, and it is

      **RECOMMENDED**, that the complaint be **DISMISSED WITHOUT**

**PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i-ii) for failure to state a claim as

against defendant **STATE OF NEW YORK only with respect to claims under the**

**ADA**, and it is

      **RECOMMENDED**, that all section 1983 claims against the **STATE OF NEW**

**YORK be DISMISSED WITH PREJUDICE**, pursuant to 28 U.S.C. § 1915(e)(2)(B)

(iii), and it is

      **RECOMMENDED**, that if the District Court approves this recommendation,

plaintiff be given thirty (30) days from the date of the District Judge's Order within

which to submit a proposed amended complaint which complies with the above Report,

and it is

      **RECOMMENDED**, that if plaintiff files a proposed amended complaint within

the time allotted or within any requested extension of time that the District Court

approves, the proposed amended complaint be returned to me for further review, and it is

**RECOMMENDED**, that if plaintiff does not file a proposed amended complaint within the above time limits, the complaint be dismissed with prejudice without further review by the court, and it is

**ORDERED**, that if the District Judge approves this Recommendation, plaintiff is reminded that any amended complaint must be a complete pleading that replaces and supercedes the original. The original complaint will have "no legal effect." Plaintiff's new proposed amended complaint may not incorporate by reference any part of her original complaint. In any amended complaint, plaintiff must clearly set forth the facts that give rise to her claim, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act, and it is

**ORDERED**, that the Clerk serve a copy of this Order and Report Recommendation on the plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 5, 2017

Hon. Andrew T. Baxter
U.S. Magistrate Judge

47